CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

DEC 28 2006

JOHN F. CORCORAN, CLERK
BY: _____
    DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | |
|---|---|
| **RALPH HONEYCUTT,** )  | |
| Plaintiff, ) | Civil Action No. 2:05cv00057 |
| ) | |
| v. ) | **MEMORANDUM OPINION** |
| ) | |
| **JO ANNE B. BARNHART,** ) | BY: GLEN M. WILLIAMS |
| **Commissioner of Social Security,** ) | SENIOR UNITED STATES DISTRICT JUDGE |
| Defendant. ) | |

In this social security case, the court affirms the final decision of the Commissioner denying benefits.

### I. Background and Standard of Review

The plaintiff, Ralph Honeycutt, filed this action challenging the decision of the Commissioner of Social Security, ("Commissioner"), denying the plaintiff's claim for a period of disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2006). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a

Case 2:05-cv-00057-GMW-PMS   Document 13   Filed 12/28/06   Page 1 of 31   Pageid#: 58

reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Honeycutt filed his application for DIB on September 22, 2003, alleging disability as of January 23, 2003, due to a back injury with two damaged discs, nerve damage and hypertension. (Record, ("R."), at 16–17, 67–69, 72, 102.) The claim was denied initially and upon reconsideration. (R. at 52–60.) Honeycutt then requested a hearing before an administrative law judge, ("ALJ"), and a hearing was held on January 6, 2005, at which Honeycutt was represented by counsel. (R. at 26–49, 61.)

By decision dated April 6, 2005, the ALJ denied Honeycutt's claim. (R. at 16–23.) The ALJ found that Honeycutt met the insured status requirements of the Act for DIB purposes through the date of the decision. (R. at 22.) The ALJ also found that Honeycutt had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 22.) The ALJ found that the medical evidence established that Honeycutt had severe impairments, namely degenerative disc disease and an adjustment disorder with mixed anxiety and depression, but he found that Honeycutt did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 21–22.) The ALJ found that Honeycutt's subjective allegations were not totally credible. (R. at

-2-

22.) Based on Honeycutt's age, education and past work history and the testimony of a vocational expert, the ALJ opined that Honeycutt had the residual functional capacity to perform simple, low-stress, light work[1] that allowed frequent postural changes. (R. at 23.) Thus, the ALJ found that Honeycutt was unable to perform any of his past relevant work. (R. at 23.) Nevertheless, based on the testimony of a vocational expert, the ALJ found that other jobs existed in significant numbers which Honeycutt could perform, including those of an assembler, a packer, a checker and an inspector. (R. at 23.) Thus, the ALJ found that Honeycutt was not under a disability as defined in the Act at any time through the date of his decision and was not eligible for DIB benefits. (R. at 23.) *See* 20 C.F.R. § 404.1520(g) (2006).

After the ALJ issued his decision, Honeycutt pursued his administrative appeals, (R. at 11–12), but the Appeals Council denied his request for review on September 23, 2005. (R. at 5–8.) Honeycutt then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R § 404.981 (2006). This case is now before the court on Honeycutt's motion for summary judgment, filed March 28, 2006, and the Commissioner's motion for summary judgment, filed May 1, 2006.

## II. Facts

Honeycutt was born in 1965, which classifies him as a "younger individual" under 20 C.F.R. § 404.1563(c) (2006). (R. at 23, 67.) Honeycutt has a high-school

---

[1] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can do light work, he also can do sedentary work. *See* 20 C.F.R. § 404.1567(b) (2006).

Case 2:05-cv-00057-GMW-PMS    Document 13    Filed 12/28/06    Page 3 of 31    Pageid#: 60

education and also received law enforcement training and vocational training as a brick mason. (R. at 17, 44.) He has past relevant work as a police officer, a pizza restaurant manager, a cook, a meat cutter and a sawmill worker. (R. at 17, 44–45.)

Honeycutt testified at his hearing that he received the injury, which lead to his alleged disability, while working as a police officer when he was struck by a car three times after issuing a ticket to the car's driver. (R. at 18, 30-31.) As a result of his injury, Honeycutt stated he was taken to the emergency room and x-rays were taken. (R. at 18, 31.) When his pain did not subside, Honeycutt saw a neurosurgeon and eventually had back surgery to correct the problem. (R. at 18, 31–32.)

Honeycutt testified that, following his surgery, he had problems standing, problems balancing, pain in his left leg and pain in his left foot. (R. at 18, 32.) He also testified that he had pain constantly, but the degree of the pain varied. (R. at 33.) He stated that his left leg had given out on him several times, causing him to fall down the stairs at his home. (R. at 36.) Honeycutt explained that he had to rest or lie down for more than an hour the last time he attempted to engage in physical activity lasting more than 10 minutes. (R. at 33–34.) As a result, Honeycutt stated that he does not do any housework, although he does get up and walk with his dog four or five times a day. (R. at 40.)

Honeycutt testified that he slept in a recliner rather than in a bed, which allowed him to sleep at an angle. (R. at 37.) He stated that he could not lie flat and sleep because it caused him pain. (R. at 37.) Honeycutt also stated that sitting straight up for any length of time resulted in hip pain and tingling in his left foot, as

well as putting pressure on the bottom of his back. (R. at 37–39.) As a result, Honeycutt stated that he spends the majority of his day in a recliner. (R. at 39–40.) Honeycutt further testified that he believed he could stand longer than he could sit, and he estimated that he could stand for about an hour. (R. at 39.) He stated that he was still able to drive, but he had to stop about every 30 to 40 minutes to move around to alleviate his pain. (R. at 38–39.)

In addition to his physical ailments, Honeycutt also testified that he had been prescribed medication for depression by his neurosurgeon, Dr. Matthew W. Wood Jr. (R. at 34.) He also stated that he saw Dr. Paul R. Kelley, M.D., for a mental health evaluation, but he stated that Dr. Kelley did "nothing" for him except suggest that he see a psychiatrist, which he never did. (R. at 42.) Honeycutt also testified that after seeing Dr. Kelley two times for evaluation, his worker's compensation would no longer pay for any psychiatric treatment because it was determined that he did not have a psychiatric problem related to his injury. (R. at 42–43.)

Norman E. Hankins, Ed.D., a vocational expert, also testified at Honeycutt's hearing. (R. at 44–46.) Hankins asserted that Honeycutt's prior work as a police officer was semiskilled work that required medium exertion.[2] (R. at 44.) Honeycutt's prior work as a sawmill worker was classified as unskilled work that required medium

---

[2] Medium work involves lifting objects weighing up to 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can perform medium work he can also perform light and sedentary work. *See* 20 C.F.R. § 404.1567(c) (2006).

to heavy exertion.[3] (R. at 45.) His prior work as a manager of a pizza restaurant was skilled work that required light to medium exertion. (R. at 44–45.) Finally, his prior work as a meat cutter was semiskilled work that required medium exertion. (R. at 45.)

The ALJ asked Hankins a series of hypothetical questions about a person's work prospects based on the assumption that the hypothetical individual was the same age, education and work background as Honeycutt. (R. at 45.) Hankins was further asked to consider that the hypothetical person was limited to light work activity, would need a job that would allow frequent postural changes and the person would be restricted to simple, low stress jobs. (R. at 45.) Hankins testified that such an individual could perform jobs existing in significant numbers in the national economy, including those of a factory worker, an assembler, a packer, a checker, a sorter and an inspector. (R. at 45.) The ALJ also stated that, if Honeycutt's pain frequently interfered with his ability to concentrate and persist at work, he would not be able to perform the jobs suggested. (R. at 45–46.) Finally, Hankins testified that it was unlikely that any of the jobs he suggested with a sit/stand option could be performed from a reclining position. (R. at 46.)

In rendering his decision, the ALJ reviewed records from Medical Associates of Southwest Virginia, ("Medical Associates"); Wellmont Lonesome Pine Hospital, ("Lonesome Pine"); Dr. D. Kevin Blackwell, D.O.; The Regional Rehab Center; Dr.

---

[3] Heavy work involves lifting objects weighing up to 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can perform heavy work, he can also perform medium, light and sedentary work. *See* 20 C.F.R. § 404.1567(d) (2006).

Matthew W. Wood Jr., M.D.; Bristol Regional Medical Center, ("BRMC"); Blue Ridge Neuroscience Center; Function Better Physical Therapy Services; Dr. Richard M. Surrusco, M.D., a state agency physician; Dr. Michael J. Hartman, M.D., a state agency physician; Julie Jennings, Ph.D., a state agency psychologist; Donna Abbott, M.A., a licensed psychological examiner; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Joseph Leizer, Ph.D., a state agency psychologist; Highlands Neurosurgery; and Dr. Paul R. Kelley, M.D. Honeycutt's attorney submitted additional documents from Highlands Neurosurgery; Norton Community Hospital, ("Norton Community"); BRMC and Medical Associates to the Appeals Council.[4]

Honeycutt presented to the emergency room at Lonesome Pine on January 23, 2003, with complaints of left hip/pelvis and left hand pain after being struck three times by an automobile while he was issuing the driver a ticket. (R. at 150–54.) He was diagnosed with a contusion and was instructed to ice the injured area and take Tylenol for pain. (R. at 152.) A radiographic examination of the pelvis, left hip and hand revealed no evidence of abnormality of the visualized bones or soft tissues; the articulations also were found to be normal. (R. at 157.) Honeycutt returned to the emergency room the next day complaining of sciatica and received instructions to apply ice locally and to take Tylenol as needed for the contusions to his hip and hand. (R. at 148–49.)

Honeycutt returned to the emergency room at Lonesome Pine again on July 24,

---

[4] Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 7–11), this court also will consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F. 2d 93, 96 (4th Cir. 1991).

2003, complaining of back pain and anxiety. (R. at 142.) After receiving treatment for his back, Honeycutt reported feeling much better and was discharged. (R. at 146.) He was instructed to apply heat, rest his back and continue his home medications. (R. at 142, 146.) He also was advised to recheck his blood pressure in three days when he was pain free. (R. at 142, 146.)

Honeycutt presented to Medical Associates with complaints of back and left leg pain on January 24, 2003. (R. at 117.) He was scheduled for a MRI and a plain film of his lumbar spine; in addition, he was prescribed Percocet and Flexeril and received a work excuse. (R. at 117.) Honeycutt was offered physical therapy but refused. (R. at 117.) The plain film and MRI were performed on January 31, 2003. (R. at 124–27.) The plain film of the lumbosacral spine revealed mild degenerative disc changes at the L3-4 and L2-3 levels of the spine with no acute bony lesions. (R. at 127.) The MRI of the lumbar spine in the axial and sagittal planes revealed a moderate-sized, broad-based central disc protrusion at the L5-S1 level of the spine causing encroachment on the thecal sac and a mild to moderate degree of central stenosis. (R. at 125.) There also was a mild, diffuse bulging of the annulus fibrosis at the L4-5 level of the spine with evidence of disc desiccation involving the lower four lumbar levels. (R. at 125.)

Honeycutt returned to Medical Associates on August 5, 2003, complaining of elevated blood pressure and stress. (R. at 115–16.) He was treated with hydrochlorothiazide, ("HCTZ"), Vistaril and Effexor. (R. at 115–16.) He followed up with Medical Associates on September 16, 2003, with complaints of escalating stress after being fired on September 11, 2003. (R. at 113.) He refused mental health

-8-

treatment due to lack of money and insurance. (R. at 113.) He also did not attend recommended diabetic teaching. (R. at 113.) He was diagnosed with hypertension, anxiety and depression and was prescribed Hyzaar and Effexor. (R. at 113.)

On November 20, 2003, Honeycutt attended a follow-up appointment for his previous diagnosis of hypertension, and was found to be "on target." (R. at 112.) Because he was having difficulty with the cost of his medication, he was given samples of Hyzaar and was prescribed Lisinopril and HCTZ. (R. at 112.) Honeycutt was diagnosed with hypertension secondary to his injury, weight gain and noncompliance. (R. at 112.)

Honeycutt presented to Medical Associates on October 21, 2004, with complaints of high blood sugar, depression and back pain. (R. at 365–66.) He was newly-diagnosed with uncontrolled diabetes mellitus and was started on Glucotrol XL and a 1800-calorie diet to control his blood sugar. (R. at 365–66.) He also was instructed to follow up with psychiatric treatment. (R. at 365.)

On November 22, 2004, Honeycutt returned to Medical Associates and was told to continue with Actos and home blood glucose monitoring. (R. at 364.) Tests performed indicated hepatomegaly and fatty infiltration of the liver. (R. at 364, 370.) He also was placed on Lisinopril to protect his kidneys. (R. at 364.)

Another follow-up occurred on January 12, 2005, and, although Honeycutt's blood sugar had been a bit high due to splurging over the holidays, it appeared more

under control. (R. at 362.) Honeycutt called on March 31, 2005, because of problems breathing, snoring, depression and low back pain. (R. at 361.) A sleep study was ordered. (R. at 361.) He continued to complain of respiratory symptoms on May 12, 2005, that were cleared with Levaquin on his visit of May 25, 2005. (R. at 359–60.)

A sleep study was performed by Dr. Elizabeth Cooperstein, M.D., on May, 2005, which revealed sleep apnea with desaturations and arousals. (R. at 348–49.) Dr. Cooperstein found that a treatment of oxygen with Continuous Positive Airway Pressure, ("CPAP"), at 20 centimeters eliminated most events of sleep apnea and recommended this as treatment. (R. at 349.)

Upon referral, Honeycutt presented to Dr. D. Kevin Blackwell, D.O., on February 3, 2003, complaining of pain in the left hip that radiated down into his left leg. (R. at 158.) Dr. Blackwell found a protrusion at the L5-S1 level of the spine, and Honeycutt was referred to a neurosurgeon. (R. at 158.) Dr. Blackwell stated that Honeycutt could return to work the following day, but temporarily limited him to nonpatrol duty and no lifting of items weighing more than 10 pounds or pulling items weighing more than 15 pounds. (R. at 159.)

Honeycutt presented to Dr. Matthew W. Wood Jr., M.D., at Highlands Neurosurgery on February 13, 2003, with complaints of pain in his left hip and leg. (R. at 220.) He complained that the pain had steadily worsened since his assault, and he reported that he could not "get comfy or walk or sit too long." (R. at 220.) Dr. Wood assessed that Honeycutt had a small acute component of disc causing

-10-

significant compression at the S1 level on the left of the spine. (R. at 220.) Because Honeycutt wanted to avoid surgery, he was given lumbar epidural steroid injections on February 20, 2003, and April 3, 2003. (R. at 220, 229–33.) Dr. Wood also excused Honeycutt from work until after his follow-up appointment for his first injection on March 10, 2003, and again until after his follow-up appointment for his second injection on April 7, 2003. (R. at 219, 221.)

On April 8, 2003, Honeycutt reported a dramatic increase in his pain, and a second MRI was ordered. (R. at 216.) Dr. Wood continued to restrict Honeycutt to sedentary activities. (R. at 216.) This MRI of the lumbar spine, dated April 8, 2003, revealed a large disc extrusion at the L5-S1 level of the spine with caudal migrating filling the anterior half of the canal and putting pressure on the S1 nerve root on the left side. (R. at 228.)

On May 5, 2003, Honeycutt went to Blue Ridge Neuroscience Center for a second opinion regarding his pain in the left hip which radiated down into his left foot. (R. at 234–37.) Dr. Ken W. Smith, M.D., agreed with Dr. Wood's assessment for surgical intervention. (R. at 237.) On May 7, 2003, Honeycutt was scheduled for surgery to repair the enlarging disc protrusion at the L5 level of the spine on May 15, 2003, and again Honeycutt was excused from work pending his surgery. (R. at 214.) On May 13, 2003, a left L4-L5 partial hemilaminectomy and foraminotomy and a left L5-S1 partial hemilaminectomy and discectomy and foraminotomy were performed on Honeycutt at BRMC. (R. at 239.) He had the staples from his surgery removed on May 20, 2003, and stated that his pain was better, but had not completely subsided. (R. at 213.)

Honeycutt returned to Dr. Wood on June 9, 2003, complaining of aching in his left leg and worry over work issues. (R. at 210.) Dr. Wood prescribed Paxil, Lortab and Robaxin. (R. at 210.) He was advised to walk and stretch as much as possible, but he was excused from work until June 27, 2003, to continue recovering from surgery. (R. at 211.) On June 27, 2003, Honeycutt returned to see Dr. Wood, and he noted that the Paxil had helped him. (R. at 207.) He reported some numbness in his left leg and aching in his lower back after prolonged driving and sitting. (R. at 207.) Dr. Wood reported that straight leg raising was negative, tendon reflexes were 1+ at the knees and ankles, and Honeycutt exhibited an improved range of motion. (R. at 207.) Dr. Wood also reported that Honeycutt would be beginning physical therapy. (R. at 207.)

On Honeycutt's July 23, 2003, appointment, his back pain had worsened, his straight leg raising on the left was positive at 80 degrees, and he exhibited tendon reflexes at 2+ at the knees and absent at the ankles. (R. at 203.) He was further excused from work until August 25, 2003, so that he could continue daily physical therapy. (R. at 204.) Dr. Wood restricted Honeycutt's bending and lifting as he recovered from surgery, but Dr. Wood noted that he expected Honeycutt to do well in his recovery. (R. at 203.)

From February 4, 2003, until August 22, 2003, Honeycutt underwent physical therapy and rehabilitation for his surgery at The Regional Rehab Center. (R. at 160–91.) Upon his discharge, it was noted that he attended therapy regularly and had an average and consistent work ethic. (R. at 160.) His daily routine included walking

-12-

one to two miles, full body flexibility, arm cycling for 20 minutes, treadmill walking for 20 minutes and body strengthening using Nautilus machines with weights ranging from 40 to 90 pounds for upper body exercises and 30 pounds for lower body exercises. (R. at 160.) It also was noted that Honeycutt would continue to benefit from additional rehabilitation. (R. at 161.)

At the end of Honeycutt's rehabilitation, a functional capacity evaluation was performed by Charles Williams Jr., a certified functional capacity evaluator at Function Better Physical Therapy Services, on August 19, 2003. (R. at 247–80.) This evaluation was performed at the request of Dr. Wood. (R. at 247.) Williams found some minor inconsistency with the reliability of Honeycutt's subjective reports of pain, and stated that "Honeycutt can do more at times than he currently states or perceives." (R. at 248.) As a result of his testing, Williams opined that Honeycutt demonstrated the physical capacity to perform medium work. (R. at 248.)

On August 25, 2003, Honeycutt was seen by Dr. Wood for complaints of worsening left leg pain. (R. at 201.) Honeycutt was scheduled for an MRI, and his functional abilities were outlined. (R. at 201–02.) At that time, Dr. Wood placed physical restrictions on Honeycutt, and assessed his physical capacities following the completion of his surgical rehabilitation and the functional capacity evaluation performed by Function Better Physicial Therapy Services. (R. at 160, 201, 208–47.) Dr. Wood found that Honeycutt could sit, stand or walk for one hour at a time and that he could sit, stand or walk for a total of seven hours during an eight-hour day. (R. at 202.) He was found able to continuously lift items weighing up to five pounds, frequently lift items weighing six to 20 pounds, occasionally lift items weighing up

Case 2:05-cv-00057-GMW-PMS   Document 13   Filed 12/28/06   Page 13 of 31   Pageid#: 70

to 50 pounds and never lift items weighing more than 50 pounds. (R. at 202.) Honeycutt was found able to use both of his hands for repetitive simple grasping, pushing and pulling of arm controls and fine manipulation. (R. at 202.) He was further found able to use both of his feet for repetitive pushing and pulling of leg controls. (R. at 202.) Dr. Wood opined that Honeycutt could not climb, but was able to occasionally bend, squat and crawl; he also was able to frequently reach. (R. at 202.) Moderate restrictions were placed on Honeycutt with respect to unprotected heights, but he was found to have only mild restrictions on his ability to be around moving machinery or to drive. (R. at 202.) Dr. Wood surmised that Honeycutt could not run or climb effectively, and he would be at a great disadvantage in a physical altercation. (R. at 202.) However, no other restrictions were placed upon his activities, and he was expressly found to be able to attend court. (R. at 202.) The MRI of the lumbar spine ordered by Dr. Wood on August 25, 2003, and dated September 3, 2003, revealed diminished signal of all discs visualized from the T12-L1 level of the spine through the L5-S1 level with the exception of the L1-L2 level, which was unchanged from the prior study. (R. at 226.) The MRI also revealed moderate disc protrusion at the T11-T12 level effacing the ventral margin of the thecal sac and appearing to abut the cord, demonstrating a slight progression from the prior study. (R. at 226.) There also was minimal diffuse disc bulge and left-sided degenerative facet changes at the L4-L5 level of the spine. (R. at 226.) Additionally, there was a left-sided laminototmy defect at the L5-S1 level with, what appeared to be, a focal area of enhancement at the caudal margin of the posterior convexity anterior to the thecal sac consistent with a small amount of granulation tissue; however, a large portion of this deformity did not enhance and was consistent with recurrent or residual disc. (R. at 226.) This defect effaced the thecal sac and the majority of the epidural fat anteriorly and also appeared to encroach on the right S1

-14-

nerve root. (R. at 226–27.)

Honeycutt continued to complain of pain in his back and in his left leg during his initial physiatric evaluation by Dr. John Marshall, M.D., at Highlands Neurosurgery, on October 3, 2003. ( R. at 197.) Dr. Marshall noted that Honeycutt had been placed on permanent restrictions by Dr. Wood, and that surgery and physical therapy had done all they could to improve his condition. (R. at 197–98.) Dr. Marshall noted some low back pain, numbness and left lower extremity pain, but he determined that Honeycutt's motor strength was at least a five on a scale of one to five. (R. at 198.)

On November 5, 2003, Honeycutt again saw Dr. Marshall, exhibiting increased agitation and complaining of increased lower back and left leg pain. (R. at 195.) Dr. Marshall wrote Honeycutt a schedule to wean himself off of Neurontin and Percocet, and he noted that Dr. Wood felt that Honeycutt now should be chronic and stable. (R. at 195.) Dr. Marshall noted that he felt Honeycutt's increased symptoms were probably psychosocial. (R. at 196.)

A repeat MRI was ordered by Dr. Wood on December 10, 2003, after Honeycutt complained of increased back pain and left leg pain. (R. at 194.) He was told to try to limit his driving to about 30 minutes and to refrain from going to the emergency room for occasional pain episodes. (R. at 194.) Honeycutt was prescribed a low dose of Methadone to address his pain without sedation. (R. at 194.) Dr. Wood also asked for an appointment with Dr. Kelley for psychiatric evaluation on Honeycutt's behalf. (R. at 194.)

-15-

The MRI ordered on December 10, 2003, was performed on December 16, 2003, and found the following: first, a diminished T2 signal involving the lumbar disc from the L2-L3 level through the L5-S1 level. (R. at 223.) Second, the L3-L4 level demonstrated minimal diffuse disc bulging and a posterior midline annular fissure, the central canal and neural foramina appeared widely patent and moderate degenerative changes were noted in the left facet. (R. at 223.) Finally, the L5-S1 level was characterized by a diminished T2 signal and a large protruding disc which had an inferior or caudal extension and appeared consistent with residual or recurrent disc. (R. at 223.) The central canal appeared stenotic and there was extension into, and apparent impingement on, the nerve root in the left-sided neural foramina. (R. at 223.) The facets demonstrated mild to moderate degenerative changes bilaterally at this level, but the findings were very similar to the prior study. (R. at 223-24.)

A follow-up on January 2, 2004, found Honeycutt mildly apprehensive and complaining of continued lower back and left leg pain. (R. at 192.) He was advised by Dr. Wood to consider further surgery to address a possible recurrence of disc protrusion at the L5 level on the left side. (R. at 192.) Upon examination, Honeycutt exhibited profound positive left straight leg raising and very significant crossed straight leg raising, his tendon reflexes were 2+ at the knees and right ankle and 1+ at the left ankle. (R. at 192.)

On March 29, 2004, Honeycutt saw Dr. Wood and reported seeing Dr. Kelley. (R. at 328.) Dr. Wood indicated that Honeycutt's restrictions were permanent and that he should continue psychiatric treatment. (R. at 328.) Dr. Wood suggested that Honeycutt be as active as possible and altered his medication to include Wellbutrin,

-16-

Paxil CR and Capsaicin cream.  (R. at 328.)

Honeycutt returned to Dr. Wood on August 4, 2004.  (R. at 327.)  Honeycutt appeared to be worse, and admitted being only minimally active with increased depression.  (R. at 327.)  However, both Honeycutt and Dr. Wood agreed that Honeycutt's pain was not significant enough for another operation.  (R. at 327.)  He was taken off Methadone because it was not helping his pain and was causing side effects, and he was placed on Neurontin.  (R. at 327.)

On October 27, 2004, Honeycutt again visited Dr. Marshall, upon the recommendation of Dr. Wood, and Dr. Marshall noted that Honeycutt's diagnosis had not changed.  (R. at 326.)  He also was instructed to follow up with Dr. Kelley or Karen DeWitt, the nurse practitioner.  (R. at 326.)

Honeycutt returned to Dr. Marshall on April 13, 2005, for his six-month follow-up.  (R. at 347.)  Dr. Marshall noted that Honeycutt was reexamined by the neurosurgery department from December 2003 through August 4, 2004.  (R. at 347.)  Dr. Marshall found that Honeycutt's diagnoses had not changed and decided to continue Honeycutt's chronic opioid contract with the Duragesic.  (R. at 347.)  He also noted the need for a psychiatric medication follow-up with Dr. Kelley or Karen DeWitt.  (R. at 347.)

On March 11, 2004, Honeycutt saw Dr. Kelley, who performed a psychiatric evaluation.  (R. at 340–45.)  Dr. Kelley concluded that Honeycutt had experienced

depression as a result of his injury. (R. at 344.) Dr. Kelley also noted that Honeycutt's presentation did not contain any discrepancies, and he noted that it was unlikely that he was malingering. (R. at 344.) Honeycutt was diagnosed with depression, not otherwise specified, and a Global Assessment of Functioning, ("GAF"), score of 55.[5] (R. at 345.) Dr. Kelley also determined that Honeycutt could return to work at any time to any job for which he was otherwise suited. (R. at 345.) Dr. Kelley recommended that Honeycutt see a psychiatrist to start antidepressant treatment, and he opined that medication alone should resolve his depression. (R. at 344.) As a result, his dosage of Paxil was increased, and Wellbutrin and Capsaicin cream were added to his treatment. (R. at 344.)

A residual physical functional capacity assessment was completed on January 30, 2004, by Dr. Richard M. Surrusco, M.D., a state agency physician. (R. at 281–88.) He found that Honeycutt could occasionally lift and/or carry items weighing up to 50 pounds, could frequently lift and/or carry items weighing up to 25 pounds, could stand and/or walk for a total of approximately six hours in an eight-hour workday, could sit for a total of about six hours in an eight-hour workday and had no limitations in his ability to push and/or pull, other than the limitations noted for lifting and/or carrying. (R. at 282.) He also opined that Honeycutt occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 284.) Honeycutt was found to have no manipulative, visual, communicative or environmental limitations. (R. at

---

[5] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994.) A GAF of 51-60 indicates that an individual has "[m]oderate symptoms . . . OR moderate difficultly in social, occupational or school functioning . . . ." DSM-IV at 32.

284–86.)  This assessment was affirmed by Dr. Michael J. Hartman, M.D., another state agency physician, on May 25, 2004.  (R. at 288.)

A Psychiatric Review Technique form, ("PRTF"), was completed on February 2, 2004, by Julie Jennings, Ph.D., a state agency psychologist.  (R. at 289–303.)  It appears that upon review on May 25, 2005, that Jennings's PRTF was disagreed with and a new PRFT was ordered; however, the recommendations and the name of the reviewer are illegible.  (R. at 325.)  A second PRTF was completed on May 25, 2004, by Joseph Leizer, Ph.D., another state agency psychologist.  (R. at 311–25.)

The PRTFs by both Jennings and Leizer determined that Honeycutt suffered from a not otherwise specified affective disorder, (R. at 289, 292, 311, 314), and Leizer more specifically stated that Honeycutt suffered from an adjustment disorder resulting in anxiety and depression.  (R. at 314.)  Both psychologists also found that Honeycutt's impairment was not severe and that his allegations were only partially credible.  (R. at 289, 301, 311, 325.)  They found mild limitations in Honeycutt's activities of daily living, social functioning and ability to maintain concentration, persistence or pace.  (R. at 299, 321.)  However, neither found any episodes of decompensation.  (R. at 299, 321.)

A psychological report was prepared by B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, and Donna Abbott, M.A., a licensed psychological examiner, on behalf of the Virginia Department of Rehabilitative Services on May 3, 2004.  (R. at 304–10.)  Lanthorn and Abbott performed a consultative mental status evaluation and also administered the Wechsler Adult Intelligence Scale - Third Edition IQ test,

-19-

("WAIS-III"). (R. at 304.) Honeycutt was found able to relate adequately with others and capable of managing his resources. (R. at 307.)

The WAIS-III was administered, and Honeycutt achieved a full-scale IQ score of 96, a verbal IQ score of 97 and a performance IQ score of 94, which placed him in the average range of current intellectual functioning. (R. at 307.) His verbal comprehension index score was 103 and perceptual organization index score was 95. (R. at 308.) As a result of his scores on the WAIS-III, his full-scale IQ score was estimated to fall between 93 and 100. (R. at 308.) Honeycutt was diagnosed as having an adjustment disorder with mixed anxiety and depression, but Lanthorn and Abbott ruled out panic disorder without agoraphobia. (R. at 308.) Honeycutt was given a then current GAF score of 60. (R. at 309.) Lanthorn noted that Honeycutt could understand and remember, could relate adequately to others and could set goals and make plans. (R. at 309.) Lanthorn opined that Honeycutt was capable of managing his own resources, driving and traveling short distances. (R. at 309.) It was determined that, with some counseling and perhaps medication, some improvement could be anticipated. (R. at 310.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2006); *see also Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a

-20-

listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520 (2006). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2006).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant maintains the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2) (West 2003 & Supp. 2006); *McLain v. Schweiker*, 715 F.2d 866, 868–69 (4th Cir. 1983); *Hall*, 658 F.2d at 264–65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated April 6, 2005, the ALJ denied Honeycutt's claim. (R. at 16–23.) The ALJ found that Honeycutt met the insured status requirements of the Act for DIB purposes through the date of the decision. (R. at 22.) The ALJ also found that Honeycutt had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 22.) The ALJ found that the medical evidence established that Honeycutt had severe impairments, namely degenerative disc disease and an adjustment disorder with mixed anxiety and depression, but he found that Honeycutt did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 21–22.) The ALJ found that Honeycutt's subjective allegations were not totally credible. (R. at

-21-

22.) Based on Honeycutt's age, education and past work history and the testimony of a vocational expert, the ALJ opined that Honeycutt had the residual functional capacity to perform simple, low-stress, light work that allowed frequent postural changes. (R. at 23.) Thus, the ALJ found that Honeycutt was unable to perform any of his past relevant work. (R. at 23.) Nevertheless, based on the testimony of a vocational expert, the ALJ found that other jobs existed in significant numbers which Honeycutt could perform, including those of an assembler, a packer, a checker and an inspector. (R. at 23.) Thus, the ALJ found that Honeycutt was not under a disability as defined in the Act at any time through the date of his decision and was not eligible for DIB benefits. (R. at 23.) *See* 20 C.F.R. § 404.1520(g) (2006).

The plaintiff argues that the ALJ's decision is not supported by substantial evidence. Specifically, Honeycutt argues that the ALJ erred in determining his residual functional capacity by finding him able to do light work. (Brief In Support of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 12–17.) Honeycutt also argues that the ALJ erred in failing to consider his pain in determining his residual functional capacity and as a disabling condition. (Plaintiff's Brief at 17–21.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided that her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed

-22-

all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439–40 (4th Cir. 1997).

While an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record support his findings.

Honeycutt argues, that the ALJ's determination that he had a residual functional capacity to perform simple, low stress light work which allowed for frequent postural changes, is not supported by substantial evidence. (Plaintiff's Brief at 12–17.) This argument is without merit. To uphold the ALJ's decision, it must be supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In this case, the court finds substantial evidence exists to support the ALJ's residual functional capacity finding.

A person's residual functional capacity is measured in terms of the work they can perform. The regulations define work in terms of exertion. *See* 20 C.F.R. § 404.1567 (2006). For the ALJ to find Honeycutt able to do light work, the ALJ would need to find him able to lift objects weighing up to 20 pounds at a time and able to frequently lift or carry objects weighing up to 10 pounds. *See* 20 C.F.R. § 404.1567(b) (2006). Additionally, light work may require a good deal of walking, standing or some pushing and pulling of leg controls. *See* 20 C.F.R. § 404.1567(b)

-23-

(2006).

Pursuant to 20 C.F.R. § 404.1527(e)(2), an ALJ is not bound by the findings of any medical source on a claimant's residual functional capacity. Instead, the responsibility for determining a claimant's residual functional capacity rests with the ALJ, and the ALJ can determine the value to give to a medical source's opinions according to the factors listed in 20 C.F.R § 404.1527(d). *See* 20 C.F.R. § 404.1527(e)(2) (2006).

In this case, the ALJ found that Honeycutt had the residual functional capacity to perform simple, low-stress light work that allowed for frequent postural changes. (R. at 23.) By definition, if Honeycutt could perform medium work he also could perform light work. *See* 20 C.F.R. § 404.1567(c) (2006). All of the objective evidence evaluating Honeycutt's functional abilities after his surgical recovery indicate that he is able to perform medium work. In particular, the ALJ noted that Honeycutt's treating physician, Dr. Wood, found Honeycutt able to undertake medium work which would entail lifting and carrying 50 pounds occasionally and 25 pounds frequently. (R. at 18, 202.) Honeycutt also was found able to sit, stand or walk for a total of seven hours in an eight-hour day. (R. at 18, 202.) These findings were made on August 25, 2003, by Dr. Wood after the back surgery he performed on Honeycutt had healed and Honeycutt had completed more than six months of physical therapy and rehabilitation. (R. at 202.) These restrictions were considered by Dr. Wood to be permanent, and reflected Honeycutt's residual physical condition after surgery. (R. at 201–02.)

-24-

Dr. Wood's assessment that Honeycutt could perform medium work was not alone in the record. The same findings were documented by Charles Williams, a certified functional capacity evaluator with Function Better Physical Therapy Services. (R. at 247–80.) He evaluated Honeycutt on August 19, 2003, also following the end of Honeycutt's rehabilitation from surgery, and found Honeycutt capable of medium work. (R. at 247–48.) Williams also added that "Honeycutt can do more at times than he currently states or perceives." (R. at 248.) Williams documented that Honeycutt was able to walk one-half mile in 14 minutes and 58 seconds with only three brief pauses, carry an item weighing 50 pounds 50 feet, push a sled weighing 140 pounds 25 feet and pull a sled weighing 140 pounds 25 feet. (R. at 248.) Honeycutt also was able to lift, on an occasional basis, items weighing up to 50 pounds from his waist to his shoulders, items weighing up to 25 pounds from the floor to his waist and items weighing 25 pounds from the floor to his shoulders. (R. at 248.)

In addition, the records of Honeycutt's physical therapy provided further documentary evidence of his physical capabilities. At the conclusion of his physical therapy, Steven Childers, a clinical exercise physiologist, and Abigail O'Hare, a physical therapist, prepared a final progress report for Dr. Wood. (R. at 160–61.) This report indicated that Honeycutt's daily workout routine, which he complied with, consisted of walking one to two miles, full body flexibility, arm cycling for 20 minutes, treadmill walking for 20 minutes and body strengthening using Nautilus machines with weights ranging from 40 to 90 pounds for upper body exercises and 30 pounds for lower body exercises. (R. at 160.)

Besides Honeycutt's own treating physicians and therapists, he also was evaluated on January 30, 2004, by state agency physician Dr. Surrusco who found Honeycutt capable of medium work. (R. at 282.) Dr. Surrusco indicated that Honeycutt's allegations were partially credible, and the limitations he described were not fully supported by the objective clinical evidence. (R. at 283.) Dr. Surrusco's report was affirmed by state agency physician Dr. Hartman on May 25, 2004. (R. at 288.)

Based on the record, every medical source evaluating Honeycutt's physical condition after his recovery from back surgery determined that he was able to perform medium work. This alone would provide substantial evidence for a finding that he could perform light work. The ALJ, however, decided to give Honeycutt "every benefit of the doubt." (R. at 20.) As a result, the ALJ evaluated Honeycutt's subjective complaints of increased pain in his back and took them into account in his determination of Honeycutt's residual functional capacity, to the extent that the alleged pain was reasonably consistent with the objective medical evidence. (R. at 20–21.) However, the ALJ did note that Honeycutt's complaints of disabling pain were not credible to the extent alleged based, in part, on Honeycutt's own statements that his pain was not bad enough to warrant additional surgery and his treating physician's determination that he could perform medium work. (R. at 21, 202, 327.)

The ALJ also limited Honeycutt's residual functional capacity to simple, low-stress light work that allowed for frequent postural changes based on Honeycutt's alleged mental limitations. (R. at 20–21, 23.) In so doing, the ALJ indicated that he was giving Honeycutt the benefit of the doubt with respect to his mental health

allegations by limiting Honeycutt to simple, low-stress jobs. (R. at 20.) This accommodation was provided despite the statements from Honeycutt's own treating psychiatrist, Dr. Kelley, that indicate the lack of any mental disability. Dr. Kelley also noted that "antidepressant medications alone would be sufficient to return Mr. Honeycutt to his pre-injury state of mind." (R. at 345.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). Furthermore, Dr. Kelley stated that "[f]rom the perspective of psychiatry Mr. Honeycutt could return to work at any time in my opinion and to any job for which he is otherwise suited." (R. at 345.) Therefore, substantial evidence is present in the record to find that any mental illness suffered by Honeycutt was nondisabling.

In making the determination that Honeycutt had a lower residual functional capacity than his treating physicians assessed, the ALJ weighed the evidence and stated that he took into account all of Honeycutt's other alleged symptoms, to the extent the symptoms were credible, such as his pain and mental impairments. (R. at 20–21.) The ALJ properly analyzed the record, weighed the *relevant* evidence and came to conclusions that were rational based on substantial evidence and, thus, the Commissioner has met her burden under the applicable case law and the Act. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439–40; *Hays*, 907 F.2d at 1456. There was substantial evidence in the record to support the ALJ's decision; therefore, the Commissioner has met her burden on this issue.

Honeycutt's second claim is that he suffers from disabling pain, which the ALJ did not properly evaluate. (Plaintiff's Brief at 17–21.) This claim also is without

merit. The Fourth Circuit has adopted a two-step process for determining whether a claimant is disabled by pain. First, there must be objective medical evidence of the existence of a medical impairment which could reasonably be expected to produce the actual amount and degree of pain alleged by the claimant. *See Craig v. Charter*, 76 F.3d 585, 594 (4th Cir. 1996). Second, the intensity and persistence of the claimant's pain must be evaluated, as well as the extent to which the pain affects the claimant's ability to work. *See Craig*, 76 F.3d at 595. However, this does not mean that the ALJ cannot use objective medical evidence to evaluate the intensity and persistence of the pain.

A claimant's allegations of pain may not be disregarded simply because there is no objective evidence of the pain itself, but the ALJ does not need to accept the claimant's allegations to the extent that they are inconsistent with the available objective evidence. *See Craig*, 76 F.3d at 595; *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989). Furthermore, "[s]ubjective evidence of pain cannot take precedence over objective medical evidence or lack thereof." *Parris v. Heckler*, 733 F.2d 324, 327 (4th Cir. 1984). Credibility determinations about the plaintiff's allegations of pain are for the ALJ to make and should be given deference. *See Shively v. Heckler*, 739 F.2d 987, 989–90 (4th Cir. 1984). Therefore, the ALJ was not required to accept the claimant's allegations if they were not supported by the objective evidence. *See Craig*, 76 F.3d at 595.

Because there was a documented impairment that could produce pain, the first step of the test outlined in *Craig* was met; therefore, in this case, the ALJ examined Honeycutt's pain pursuant to the second step of the *Craig* test. (R. at 21.) *See* 76

F.3d at 594–95. The ALJ properly evaluated Honeycutt's allegations of pain and determined that Honeycutt's allegations of disabling pain were not supported by the documentary evidence. (R. at 21.) In so doing, the ALJ found that, while the objective medical evidence established Honeycutt had a back impairment that could reasonably be expected to cause some pain and limitations, it did not cause pain to the severity alleged. (R. at 21.)

In support of this finding, the ALJ noted that Honeycutt, himself, admitted that his pain was not severe enough to warrant another back surgery. (R. at 21, 327.) Additionally, Honeycutt's own treating physician found Honeycutt able to perform medium work despite his back pain. (R. at 21, 202.) Finally, the ALJ noted that Honeycutt's own daily activities, which included visiting his parents, walking his dog, watching television, performing self-help skills, driving an automobile and occasional grocery shopping also were inconsistent with a person who suffered from disabling pain. (R. at 21.) Therefore, the ALJ properly evaluated Honeycutt's allegations of pain, as well as the extent to which they impacted his ability to work, pursuant to *Craig*. *See* 76 F.3d at 595. Thus, the ALJ's conclusion is supported by substantial evidence.

Furthermore, additional evidence exists on the record to support the ALJ's conclusion. For example, it was noted by Charles Williams, who evaluated Honeycutt's functional capacity at the request of Honeycutt's treating physician Dr. Wood, that "Honeycutt can do more at times than he currently states or perceives." (R. at 248.) After testing Honeycutt's physical capabilities, Williams also found Honeycutt able to perform medium work. (R. at 248.) Honeycutt's own physical

Case 2:05-cv-00057-GMW-PMS   Document 13   Filed 12/28/06   Page 29 of 31   Pageid#: 86

therapists also documented his rehabilitation workouts, which included walking one to two miles a day and upper body strengthening exercises using 40 to 90 pounds of weight. (R. at 160.) Dr. Surrusco, a state agency physician, noted that Honeycutt's "[a]llegations are partially credible in that limitations as described are not fully supported by the objective clinical evidence" and that Honeycutt could perform the elements medium work. (R. at 281–88.) Dr. Marshall, another of Honeycutt's treating physicians, noted that Honeycutt's increased pain symptoms were "probably psychosocial." (R. at 196.) Finally, Dr. Wood stated that Honeycutt's pain was not severe enough to warrant surgery. (R. at 327.)

Despite this evidence, and a great deal of documentation that Honeycutt could perform medium work, the ALJ gave Honeycutt the benefit of the doubt with respect to his allegations of pain and limited Honeycutt's residual functional capacity to performing simple, low-stress light work that allowed for frequent postural changes. (R. at 23.) Therefore, it is clear from the record that the ALJ properly evaluated Honeycutt's pain claims and the documentary evidence in the record before coming to a reasonable decision that is supported by substantial evidence.

## IV. Conclusion

For the foregoing reasons, the plaintiff's motion for summary judgment is overruled and the Commissioner's motion for summary judgment is sustained.

An appropriate order will be entered.

-30-

**DATED:** This 28th day of December 2006.

_____
**THE HONORABLE GLEN M. WILLIAMS**
**SENIOR UNITED STATES DISTRICT JUDGE**